**PUBLISHED**

Filed: June 10, 2005

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

DAVID PEAGLER, personal
representative of the Estate of
Kathy Marie Thompson,

*Plaintiff-Appellee,*

v.

USAA INSURANCE COMPANY,

*Defendant-Appellant.*

No. 04-2257

## ORDER OF CERTIFICATION

TO: THE HONORABLE CHIEF JUSTICE AND JUSTICES OF THE SOUTH CAROLINA SUPREME COURT

Pursuant to Rule 228 of the South Carolina Appellate Court Rules, we certify the question that is set forth herein to the South Carolina Supreme Court.

I

*Nature of the Controversy*

Kathy Thompson was fatally injured when her husband, Greg, was unloading shotguns from the pickup truck she was occupying. At the time of the accident, Kathy Thompson and her husband were covered under an automobile insurance policy issued to them by USAA Insurance Company (USAA). On October 24, 2002, David Peagler (Peagler), the personal representative of the estate of Kathy Thompson, brought this action in the South Carolina Court of Common Pleas for Clarendon County. The action was removed to the United States

District Court for the District of South Carolina on November 25, 2002, based on diversity of citizenship. The action seeks a declaration: (1) "that there does exist a causal connection between the vehicle and the injury which resulted in the decedent's death"; (2) "that no act of independent significance breaks the causal link between the vehicle and the injury"; and (3) "that the vehicle was being used for transportation at the time of the injury which resulted in the decedent's death." (J.A. 7).

## II

### *Relevant Facts and Procedural History*

The facts relevant to the certified question presented are not in dispute, as the parties in the court below entered into the following stipulation of facts:

1. That on August 31, 2001, Gregory A. Thompson, 5190 Long Branch Drive, Dalzell, South Carolina, [and] USAA Casualty Insurance Company had an existing binding contract of insurance, policy number 0036-72-21C-7104-4. That a 1992 Ford Taurus four-door sedan and a 2000 Ford F-150 4x4 super cab pickup truck were the covered vehicles and Gregory A. Thompson and Kathy M. Thompson were identified as the vehicles' operators.

2. That on the morning of August 31, 2001, Kathy Marie Thompson, and her two children, Kyle and Jared, exited their home for purposes of traveling to school and work. That Kathy Thompson and her children entered her Taurus Sedan at which point attempts to start the sedan failed. That Mr. Gregory A. Thompson was summoned outside by his wife and he too attempted to start the Taurus sedan with no success. That the Taurus sedan was later determined to have had a dead battery which required repair. That Mr. Thompson and his wife went back into their home at which time Mr. Thompson retrieved the keys to his Ford pickup truck with the two planning that she would take his truck for purposes of

dropping the children off at school and her going to work. That Mr. Thompson was to repair Mrs. Thompson's Taurus sedan and switch vehicles with her later in the day.

3. That Mrs. Thompson exited the Thompson residence, gathered up her two sons, and began loading her children and herself into the parked Ford pickup truck. That Mrs. Thompson entered the cab of the four-door pickup truck taking a seat in the driver's position at which time she cranked the engine of the truck, closed the door and wrapped her seatbelt around her. That their oldest son, age 14, entered the front passenger section of the Ford pickup truck taking a seat in the right front passenger seat fastening his seatbelt and shutting the door. That Mrs. Thompson's youngest son, age 9, opened the rear driver's side door for purposes of entering the vehicle at which time he saw two cased shotguns lying across the rear seating area of the pickup truck with the butt ends of the shotguns lying in the passenger side rear seat area and the barrel ends of the shotgun lying in the driver's side rear seat area. That Mrs. Thompson's son alerted his mother to the existence of the guns at which time Kathy Marie Thompson instructed her youngest [son] to go into the house and advise Mr. Thompson to come out and unload the guns from the vehicle.

4. That Mr. Thompson came out of his residence along with his 9 year old son at which time his son went around to the rear passenger side door, which he had previously opened. That Greg Thompson went to the passenger side rear door which he opened and then entered the cab area of the truck lifting the guns off the rear seating area and placing the barrel of the guns pointing toward the floor with the butt ends pointing towards the truck's rear window. That he assisted his 9 year old son in getting into the truck cab, moved his book bag over, and helped him fasten his seat belt at which point his 9 year old son shut his door. That Mr. Thompson, now situated with his left knee on the

truck's rear seat and his right foot on a truck running board, again lifted the guns and began to exit the vehicle, when almost instantaneous with his lifting the guns from the floor and beginning to exit the vehicle, one of the shotguns discharged striking Kathy Marie Thompson in the torso with shotgun pellets traveling between the front seats on to break the left side driver's door glass. None penetrated the metal skin of the truck. The fact that the truck's engine was running did not cause or contribute to the discharge of the shotgun.

5. That Kathy Marie Thompson died within seconds as a result of wounds received from the discharge of a shotgun.

6. That the shooting of Mrs. Thompson was not intentional and it occurred when Mr. Thompson was unloading two or more cased shotguns from the Ford pickup truck. That Mr. Thompson believed that all the shotguns were unloaded, based on his knowledge of having unloaded his shotgun after its use the previous day and after having asked his 14 year old son if he had unloaded his shotgun prior to putting it in the truck to which his son answered in the affirmative. That the Mossburg shotgun that discharged was the gun used by Mr. Thompson's 14 year old son.

7. That the prior day Mr. Thompson and his older son loaded two shotguns into the Ford pickup and traveled to hunting grounds to scout deer and practice shooting their guns preparing for hunting season which opened September 1, 2001. That while out of the vehicle, on August 30, 2001, while the guns were uncased, it began to rain at which time Mr. Thompson and his oldest son placed their guns back in their cases and placed them on the rear seating area of the Ford truck. That Mr. Thompson and his son returned home over a route of approximately 40 miles which involved both improved and unimproved roadways. That USAA did not specifically know that Mr. Thompson was a hunter, but understood

and foresaw that trucks of this type are frequently used in hunting.

8. That the definition of "transportation," "operation," and "use of vehicle" are not defined in the definition section of the policy. The term "occupying" is defined in the policy.

(J.A. 12-15).[1]

As noted above, in November 2002, Peagler's declaratory judgment action was removed to the United States District Court for the District of South Carolina. After the parties entered into the stipulation of facts, both parties filed motions for summary judgment. On June 24, 2004, the district court granted Peagler's motion and denied USAA's motion. USAA filed a motion to alter or amend under Rule 59(e), which was denied. USAA filed a timely notice of appeal.

III

*Contentions of the Parties*

We begin our discussion by noting that the parties do not take issue with certain South Carolina legal principles. First, the parties agree that, in South Carolina, "[n]o automobile insurance policy may be issued or delivered in this State . . . unless it contains a provision insuring the persons defined as insured against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use" of a motor vehicle. S.C. Code Ann. § 38-77-140; *see also* S.C. Code Ann. § 38-77-30(10.5) (defining "[p]olicy of automobile insurance" as a "a policy or contract for bodily injury or property damage liability insurance issued or delivered in this State covering liability arising from the ownership, maintenance, or use of any motor vehicle"). The parties also agree that, when determining whether an injury arises out of the ownership, maintenance, or use of a motor vehicle, the three-part test enunciated in *State Farm Fire & Casualty*

---

[1]The policy defines "occupying" as "in, on, getting into or out of." (J.A. 25).

*Co. v. Aytes*, 503 S.E.2d 744 (S.C. 1998), applies. The three-part test, as set forth in *Aytes*, is as follows: (1) "the party seeking coverage must establish a causal connection between the vehicle and the injury," *id.* at 745; (2) "there must exist no act of independent significance breaking the causal link," *id.*; and (3) "it must be shown the vehicle was being used for transportation at the time" of the injury. *Id.*

With regard to the first part of the *Aytes* test, the South Carolina Supreme Court explained in *Aytes* that causal connection means: (1) the vehicle was an "active accessory" to the assault; (2) something less than proximate cause, but something more than the vehicle being the mere site of the injury; and (3) that the injury was "foreseeably identifiable with the normal use of the vehicle." *Id.* at 745-46 (citation and internal quotation marks omitted); *see also State Farm Mut. Auto. Ins. Co. v. Bookert*, 523 S.E.2d 181 (S.C. 1999) (applying the *Aytes* factors in determining whether the necessary causal connection was present).

USAA contends that there was no causal connection between the pickup truck and the injury. According to USAA, the truck was not an active accessory because the only connection between the truck and the injury is the fact that Kathy Thompson was seated in the vehicle at the time of the shooting. Along a similar vein, USAA suggests the truck played no role in the creation of the injury because, in effect, the injury did not depend on the truck, as Kathy Thompson's injury could have happened "anywhere else." Appellant's Br. at 12. Moreover, USAA posits that the truck was the mere situs of the injury. Finally, USAA suggests that the accidental discharge of a shotgun is not foreseeably identifiable with the normal use of a vehicle.

Peagler counters by arguing that there is a causal connection between the pickup truck and the injury because the loading and unloading of firearms is an acceptable and foreseeable use of the truck. Peagler posits that Kathy Thompson's fatal injury would not have occurred unless the truck was being used to unload firearms for the purpose of transporting passengers. Finally, Peagler suggests that the accidental discharge of a shotgun is foreseeably identifiable with the common event of unloading of firearms.

With regard to the second part of the *Aytes* test, USAA contends that three acts of independent significance broke the alleged causal link between the pickup truck and the injury. First, USAA contends that the alleged causal link is broken because at least one of the shotguns was left in the truck for approximately twelve hours with its safety disengaged. According to USAA, this fact "dispels any notion that the injury was caused by a normal use of the vehicle." Appellant's Br. at 19. Second, USAA contends that the alleged causal link is broken because Greg Thompson picked up the two shotguns in his "arms at once rather than taking them out of the truck one-by-one." *Id.* According to USAA, if Greg Thompson had taken the shotguns out of the truck one at a time, the accident would not have occurred. Third, USAA contends that the alleged causal link is broken because the shotgun that discharged was in its case.

In response, Peagler contends that there was no act of independent significance breaking the causal link between the pickup truck and the injury. According to Peagler, the injury occurred when Greg Thompson negligently handled the shotguns while removing them from the truck. As Peagler's argument goes, each of the alleged acts of independent significance were not independent of the cause of the injury —the negligent use and handling of shotguns.

With regard to the third part of the *Aytes* test, USAA contends that the pickup truck was not being used for transportation purposes at the time the injury occurred. USAA points out that, at the time the injury occurred, the truck was not moving and the passenger side door was open. USAA suggests that the truck was not in the process of transporting passengers to another location, though it concedes that such transportation was imminent. USAA also suggests that the intended use of the truck—transportation of the children to school—could not begin until the shotguns were removed because it would "have been unlawful for Mrs. Thompson to carry weapons onto the school grounds in the truck." Appellant's Br. at 22.

Peagler, in response, takes the position that the pickup truck was being used for transportation purposes at the time of the injury. According to Peagler, Kathy Thompson's use of the truck for transportation purposes "commenced when the driver's side door was opened, the driver loaded herself into the driver's seat, and started the

truck's engine awaiting the remaining passengers to load." Appellee's Br. at 27. Moreover, Peagler suggests that the "truck was being used for transportation inasmuch as loading passengers into and concurrently, in accommodation, and in adherence to South Carolina gun laws, unloading the guns from the truck was inextricably linked part and parcel of the use to which the truck was then being put." *Id.*

We have reviewed the existing South Carolina case law on the question of what constitutes ownership, maintenance, or use of a motor vehicle, particularly the following cases: *Doe v. S.C. State Budget and Control Bd.*, 523 S.E.2d 457 (S.C. 1999); *Bookert*; *Aytes*; *Home Ins. Co. v. Towe*, 441 S.E.2d 825 (S.C. 1994); *Wausau Underwriters Ins. Co. v. Howser*, 422 S.E.2d 106 (S.C. 1992); *Wrenn & Outlaw, Inc. v. Employers' Liab. Assurance Corp.*, 142 S.E.2d 741 (S.C. 1965); *Coletrain v. Coletrain*, 121 S.E.2d 89 (S.C. 1961); *Travelers Indem. Co. v. Auto World of Orangeburg, Inc.*, 511 S.E.2d 692, 698 (S.C. Ct. App. 1999); *Carraway v. Smith*, 467 S.E.2d 120 (S.C. Ct. App. 1995); and *Hite v. Hartford Accident & Indem. Co.*, 344 S.E.2d 173 (S.C. Ct. App. 1986). Following this review, we conclude that there is no South Carolina case dispositive on the close question of whether Kathy Thompson's fatal injury arose out of the ownership, maintenance, or use of a motor vehicle.

## IV

### *Questions Certified*

We certify the following question to the South Carolina Supreme Court:

(1)   Did Kathy Thompson's fatal injury arise out of the "ownership, maintenance, or use" of a motor vehicle? S.C. Code Ann. §§ 38-77-30(10.5), 38-77-140.

This court acknowledges that the Supreme Court of South Carolina may reformulate this question.

## V

## *Conclusion*

We conclude that there is no precedent from the South Carolina Supreme Court or the South Carolina Court of Appeals dispositive of the question certified. Pursuant to the privilege made available by Rule 228 of the South Carolina Appellate Court Rules, we respectfully:

(1) Certify this matter to the South Carolina Supreme Court for resolution of the question presented in Part IV of this Order of Certification;

(2) Order the Clerk of this court to forward to the South Carolina Supreme Court, under the official seal of this court, a copy of this Order of Certification, together with the original or copies of the record before this court to the extent requested by the South Carolina Supreme Court; and

(3) Order that any request for all or part of the record be fulfilled by the Clerk of this court simply upon notification from the Clerk of the South Carolina Supreme Court.

This Order of Certification is entered with the concurrences of Judge Gregory and Judge Duncan, United States Circuit Judges.

/s/ Clyde H. Hamilton

Judge Clyde H. Hamilton
Senior United States Circuit Judge

June 10, 2005